# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: | : |
| | : |
| **TERRORIST ATTACKS ON** | : |
| **SEPTEMBER 11, 2001** | : |
| | : |
| | : |
| | : |
| _____ | : |
| | : |
| **ALEXANDER ROMERO**, a surviving | : |
| Child of Elvin Romero, Deceased | : |
| | : |
| **GABRIELLA ROMERO**, a surviving | : |
| Child of Elvin Romero, Deceased | : |
| | : |
| **JAMES CASAZZA**, a surviving Sibling | : |
| of John F. Casazza, Deceased | : |
| | : |
| **MICHAEL CASAZZA**, a surviving | : |
| Sibling of John F. Casazza, Deceased | : |
| | : |
| **THOMAS CASAZZA**, a surviving | : |
| Sibling of John F. Casazza, Deceased | : |
| | : |
| **DONNA KALWAIC**, a surviving Sibling | : |
| of John F. Casazza, Deceased, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| **ISLAMIC REPUBLIC OF IRAN** | : |
| Foreign Minister of Iran | : |
| Ministry of Foreign Affairs | : |
| Imam Khomeini Street | : |
| Tehran, Iran  11369 | : |
| | : |
| **IRAN'S MINISTRY OF INFORMATION** | : |
| **AND SECURITY** | : |
| Foreign Minister of Iran | : |
| Ministry of Foreign Affairs | : |
| Imam Khomeini Street | : |
| Tehran, Iran  11369 | : |
| | : |
| | : |
| | : |

**ISLAMIC REVOLUTIONARY** :
  **GUARD CORPS** :
Foreign Minister of Iran :
Ministry of Foreign Affairs :
Imam Khomeini Street :
Tehran, Iran  11369 :
  :
**MINISTRY OF ECONOMIC** :
**AFFAIRS AND FINANCE** :
Foreign Minister of Iran :
Ministry of Foreign Affairs :
Imam Khomeini Street :
Tehran, Iran  11369 :
  :
**MINISTRY OF COMMERCE** :
Foreign Minister of Iran :
Ministry of Foreign Affairs :
Imam Khomeini Street :
Tehran, Iran  11369 :
  :
**MINISTRY OF DEFENSE AND** :
**ARMED FORCES LOGISTICS** :
Foreign Minister of Iran :
Ministry of Foreign Affairs :
Imam Khomeini Street :
Tehran, Iran  11369 :
  :
**MINISTRY OF PETROLEUM** :
Foreign Minister of Iran :
Ministry of Foreign Affairs :
Imam Khomeini Street :
Tehran, Iran  11369 :
  :
**CENTRAL BANK OF IRAN** :
  *aka* **BANK MARKAZI** :
Foreign Minister of Iran :
Ministry of Foreign Affairs :
Imam Khomeini Street :
Tehran, Iran  11369 :
  :
144, Mirdamad Blvd. :
Tehran, Iran  11369 :
  :
**NATIONAL IRANIAN OIL** :
  **COMPANY** :
Hafez Crossing, Taleghani Avenue, :
Tehran, Iran  11369 :
  :

|  | : |
|---|---|
| **NATIONAL IRANIAN TANKER** | : |
| **COMPANY** | : |
| 65 Shahid Atefi Street, Africa Expressway, | : |
| Tehran, Iran  11369 | : |
|  | : |
| **NATIONAL IRANIAN GAS** | : |
| **COMPANY** | : |
| National Iranian Gas Company Building, | : |
| South Aban Street, Karimkhan Boulevard, | : |
| Tehran, Iran  11369 | : |
|  | : |
| **NATIONAL IRANIAN** | : |
| **PETROCHEMICAL COMPANY** | : |
| 144, North, Sheikh Bahaie Avenue, | : |
| P.O. Box 19395-6896, | : |
| Tehran, Iran  11369 | : |
|  | : |
| **IRAN AIR,** *aka* **THE AIRLINE OF** | : |
| **THE ISLAMIC REPUBLIC OF IRAN** | : |
| Iran Air H.Q., | : |
| Mehrabad Airport, | : |
| P.O. Box 13185-775, | : |
| Tehran, Iran  11369 | : |
|  | : |
| and | : |
|  | : |
| **HEZBOLLAH** | |
| Valiasr Avenue | |
| Shahid Rahimi Alley No. 75 | |
| Tehran, Iran  11369, | |

Defendants.

-----------------------------------------------------

# COMPLAINT

Plaintiffs in this action are six (6) family members of two (2) Decedents who were murdered as a result of the terrorist attacks against the United States on September 11, 2001.  The instant lawsuit is filed by the same counsel who previously obtained judgments against the fourteen (14) Defendants named herein in *Havlish, et al. v. bin Laden*, *et al.*, 1:03-cv-09848 (GBD)(SN)

and *Hoglan, et al. v. Islamic Republic of Iran*, *et al.*, 1:11-cv-07550 (GBD)(SN). Plaintiffs seek compensatory and punitive damages against Defendants for their role in providing direct, material support to al-Qaeda in carrying out the attacks on September 11, 2001 ("9/11" or "9/11 attacks"). In support of their claims, Plaintiffs state the following:

## INTRODUCTION

1.      On September 11, 2001, 2,976 individuals, referred to herein as "Decedents," were murdered when nineteen (19) terrorists caused four airliners to crash into the World Trade Center Towers in New York, the Pentagon Building in Arlington County, Virginia and a field near the town of Shanksville, Pennsylvania. The nineteen (19) hijackers (hereinafter collectively referred to as the "al-Qaeda hijackers" or the "hijackers") were members of a network known as al-Qaeda, a terrorist organization dedicated to the destruction of the United States and its citizens. The al-Qaeda organization was, and is, dedicated to the goal of establishing a universal Islamic state through the use of violence. Immediately prior to the 9/11 attacks, al-Qaeda maintained its headquarters in Afghanistan.

2.      The leader of al-Qaeda was Osama bin Laden (hereinafter referred to as "bin Laden"), a former citizen of Saudi Arabia who, prior to his death on May 2, 2011, planned, conspired, funded, directed, controlled, and engaged in terrorist activities and pursuits involving intentional and willful mass murder of thousands of innocent men, women, and children, including the victims of the 9/11 terrorist attacks. On several occasions, bin Laden admitted al-Qaeda's participation in, and responsibility for, the 9/11 attacks.

3.      Al-Qaeda trained, funded and supported the hijackers, with the aid and assistance of various individuals, organizations and governments, including Defendants named herein - the Islamic Republic of Iran ("Iran"), seven (7) of Iran's political subdivisions, and six (6) of its agencies and instrumentalities, including Iran's terrorist proxy, Hezbollah.

4.   For years prior to the 9/11 attacks, bin Laden had declared and advocated "*jihad*" - holy war - against the United States.  For example, on February 23, 1998, bin Laden urged jihad against Americans and published in the newspaper *Al Quds al-Arabi* the following: "*the ruling to kill the Americans and their allies - civilians and military - is an individual duty for every Muslim who can do it in any country in which it is possible to do it.*"  On August 20, 1998, President Clinton advised that the United States was taking military action against terrorist objectives in Afghanistan and Sudan: "*Our target was terror; our mission was clear: to strike at the network of radical groups affiliated with and funded by Osama Bin Laden, perhaps the preeminent organizer and financer of international terrorism in the world today.*"  On August 21, 1998, the United States Department of State found that: "*Bin Laden's network leads, funds and inspires a wide range of Islamic extremist groups that perpetrate acts of terrorism around the world.*"

5.   In conducting their terrorist activities, bin Laden and al-Qaeda received financial, logistical and other material support from foreign states.  In particular, Defendants provided bin Laden and al-Qaeda with material support that aided the 9/11 terrorist attacks.  Plaintiffs now seek to hold the Defendants accountable for their role in facilitating these murders.

## JURISDICTION AND VENUE

6.   Jurisdiction arises pursuant to 28 U.S.C. § 1330(a)-(b) (suits against foreign states), § 1331 (federal question) and § 1332(a)(2) (diversity of citizenship via an action by citizens of a State against citizens or subjects of a foreign state).

7.   Jurisdiction also arises under the anti-terrorism exception to foreign sovereign immunity codified at 28 U.S.C. § 1605A.

8.   Jurisdiction also arises under 28 U.S.C. § 1605B, which abrogates foreign sovereign immunity in cases where money damages are sought against a foreign state in connection with an act of international terrorism which occurs in the United States.  By statute, the

courts of the United States "shall have exclusive jurisdiction in any action in which a foreign state is subject to the jurisdiction of a court of the United States under section 1610B, title 28, United States Code." *See* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 5(a), 130 Stat. 852, 854 (2016) (codified at 28 U.S.C. § 1605B note).

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(1).

10.      Venue is proper in this District because the Air Transportation Safety and System Stabilization Act, 49 U.S.C. 40101 note, mandates that this District "shall have original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes on September 11, 2001." *See* § 408(b)(3).

11.      Venue is also proper in this District because the Multidistrict Litigation captioned *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (SN) is situated in this Court.

12.      As herein alleged, actions for wrongful death, personal injury and related torts perpetrated by the Defendants through the foreign state itself, its political subdivisions, its agencies and instrumentalities, and through Iran's officials, employees and agents, fall within the exceptions to jurisdictional immunity contained in the Foreign Sovereign Immunities Act, specifically the terrorism exceptions contained at 28 U.S.C. §§ 1605A and 1605B.

## PLAINTIFFS

13.      **Alexander Romero**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Child of Elvin Romero, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by Osama bin Laden and al Qaeda and to which Defendants provided direct, material support and assistance in furtherance of the attacks.  **Alexander Romero** brings a claim for solatium damages.

14.    **Gabriella Romero**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Child of Isaac Romero, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by Osama bin Laden and al Qaeda and to which Defendants provided direct, material support and assistance in furtherance of the attacks. **Gabriella Romero** brings a claim for solatium damages.

15.    **James Casazza**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of John F. Casazza, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by Osama bin Laden and al Qaeda and to which Defendants provided direct, material support and assistance in furtherance of the attacks. **James Casazza** brings a claim for solatium damages.

16.    **Michael Casazza**, a citizen of the United States and a resident of the State of New Jersey, is a surviving Sibling of John F. Casazza, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by Osama bin Laden and al Qaeda and to which Defendants provided direct, material support and assistance in furtherance of the attacks. **Michael Casazza** brings a claim for solatium damages.

17.    **Thomas Casazza**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of John F. Casazza, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by Osama bin Laden and al Qaeda and to which Defendants provided direct, material support and assistance in furtherance of the attacks. **Thomas Casazza** brings a claim for solatium damages.

18.    **Donna Kalwaic**, a citizen of the United States and a resident of the State of New York, is a surviving Sibling of John F. Casazza, one of the Decedents murdered as a result of the terrorist attacks of September 11, 2001, that were carried out by Osama bin Laden and al Qaeda and to which Defendants provided direct, material support and assistance in furtherance of the

attacks.  **Donna Kalwaic** brings a claim for solatium damages.

## DEFENDANTS

### *Islamic Republic Of Iran And Iran's State Actors*

19.    Defendant Islamic Republic of Iran ("Iran") is a foreign state within the meaning of 28 U.S.C. § 1391(f).  Iran maintains an Interest Section within the United States at the Embassy of Pakistan at 2204 Wisconsin Avenue, N.W., Washington, D.C. 20007.

20.    Iran has been waging virtually an undeclared war against the United States and Israel for thirty years.  Iran wages this undeclared war through asymmetrical, or unconventional, strategies and terrorism, often through proxies such as Hezbollah, HAMAS, al-Qaeda and others.

21.    Iran has for many years been designated as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).  Iran has been so designated by the U.S. Department of State every year since 1984.  Iran has repeatedly been found liable under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*, for deaths and injuries caused by its activities as a state sponsor of international terrorism, particularly in connection with acts perpetrated by the paramilitary terrorist organization sponsored by Iran known as "Hizballah" or "Hezbollah."  Iran's involvement in international terrorism has been documented in a long line of cases in both this Court and the United States District Court for the District of Columbia, including recent decisions in *Estate of Heiser v. Islamic Republic of Iran*, 659 F.Supp.2d 20 (D.D.C. 2009), *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52 (D.D.C. 2010) and *Havlish v. bin Laden*, 2012 WL 3090979 (S.D.N.Y. 2012).  *See also* Findings of Fact and Conclusions of Law entered by the Honorable George B. Daniels in *Havlish, et al. v. bin Laden, et al.* on December 22, 2001.

22.    Since the time Iran was designated by the State Department as a state sponsor of terrorism, a large body of evidence has been collected and analyzed which shows conclusively that

Iran views terrorism as an instrument of state policy, like diplomacy or military power - a tool to be used to further political objectives.  The evidence shows that Iran has, over the years, directly carried out assassinations, bombings and other terrorist acts against its enemies, and Iran has also carried out such terrorist acts through its terrorist proxy, Hezbollah.  Iran has also provided direct and indirect support to international terrorist groups, sometimes directly, and other times through Hezbollah, in the form of money, training, sanctuary, documentation, intelligence, weapons and other types of assistance.  Al-Qaeda is one such terrorist organization that has received direct and material support from Iran and Hezbollah.

23.    To carry out its policy of terrorism and support for terrorist groups, Iran has created and used government organizations including intelligence ministries, the military, and various types of quasi-governmental companies and entities which are directly answerable to, and receive instructions from, the Islamic regime in power in Iran.  Some of these entities are named herein as state actors, *i.e.*, part and parcel of the Islamic Republic of Iran; others are named herein as the "Instrumentality Defendants."

24.    As described herein, Iran acted through its officials, officers, agents, employees, agencies and instrumentalities in providing direct and material support, and resources, to Defendant al-Qaeda.  The support provided by Iran included assistance in, and contribution to, the preparation and execution of the plans that culminated in the hijacked flights and the extrajudicial killings of the Decedents on 9/11.

25.    The following governmental entities and political subdivisions of the government of the Islamic Republic of Iran are named as Defendants in this action:

(a)    Iran's Ministry of Information and Security ("MOIS") is a political subdivision of the nation-state the Islamic Republic of Iran.  This agency has core functions which are governmental, not commercial, in nature.  This agency was established by law,

its head is appointed by the president subject to confirmation by the parliament, its budget is proposed by the president and approved by the parliament, and its funding comes almost entirely from general tax revenues. Iran's MOIS is a well-funded and skilled intelligence agency with an annual budget between $100 million and $400 million. MOIS has been a key instrument of the government of Iran for its material support of terrorist groups like Hezbollah and as a terrorist agency of the Iranian government. Many of the U.S. State Department reports on global terrorism over the past twenty-five (25) years refer to MOIS as Iran's key facilitator and director of terrorist attacks. MOIS has been found to be an instrumentality of Iran for purposes of liability and damages under the Foreign Sovereign Immunities Act. *See, e.g., Sutherland. v. Islamic Republic of Iran,* 151 F.Supp.2d 27 (D.D.C. 2001). With a large budget and extensive organization, MOIS is one of the most powerful ministries in the Iranian government. The ministry has traditionally operated under the guidance of the *Velayat–e Faqih* apparatus of the Supreme Leader.

(b)    The Islamic Revolutionary Guard Corps ("IRGC") is a political/military subdivision of the nation-state the Islamic Republic of Iran. This agency has core functions which are governmental in nature. The IRGC was established by the Iranian constitution, which sets forth the IRGC's responsibilities and powers. The IRGC reports directly to Iran's Supreme Leader, and it operates as an agent and instrumentality of the Supreme Leader himself. The IRGC is a military force parallel to the regular Iranian military and to the formal governmental structure. The IRGC's funding comes in large part from general tax revenues, yet the IRGC also owns and controls hundreds of companies and commercial interests, and it holds billions of dollars in military, business, and other assets and government contracts. The IRGC has a special foreign division, known as the *Qods* (or *Quds* or "Jerusalem") Force, which is the arm of the IRGC that works with militant

organizations abroad and promotes terrorism overseas. The Qods Force has a long history of engaging in coups, insurgencies, assassinations, kidnappings, bombings, and arms dealing, and it is one of the most organized, disciplined, and violent terrorist organizations in the world. The U.S. State Department has designated the IRGC as a "foreign terrorist organization," and the U.S. Treasury Department has designated the IRGC-Qods Force as a "terrorist organization." As a government agency, the IRGC maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC 20007.

(c)    Iran's Ministry of Economic Affairs and Finance ("IMEAF") is a political subdivision of the nation-state the Islamic Republic of Iran. This agency has core functions which are governmental, not commercial, in nature. This agency was established by law, its head is appointed by the president subject to confirmation by the parliament, its budget is proposed by the president and approved by the parliament, and its funding comes almost entirely from general tax revenues. All Iranian government ministries are responsible for carrying out the policies of the Iranian government, among them state support for terrorism. The IMEAF, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC 20007. The IMEAF funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendant Hezbollah and al-Qaeda.

(d)     Iran's Ministry of Commerce ("IMOC") is a political subdivision of the nation-state the Islamic Republic of Iran.  This agency has core functions which are governmental, not commercial, in nature.  This agency was established by law, its head is appointed by the president subject to confirmation by the parliament, its budget is proposed by the president and approved by the parliament, and its funding comes almost entirely from general tax revenues.  All Iranian government ministries are responsible for carrying out the policies of the Iranian government, among them state support for terrorism.  The IMOC, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY  10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC  20007.  The IMOC funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendants Hezbollah and al-Qaeda.

(e)     Iran's Ministry of Defense and Armed Forces Logistics ("IMDAFL") is a political/military subdivision of the nation-state the Islamic Republic of Iran.  This agency has core functions which are governmental, not commercial, in nature.  This agency was established by law, its head is appointed by the president subject to confirmation by the parliament, its budget is proposed by the president and approved by the parliament, and its funding comes almost entirely from general tax revenues.   All Iranian government ministries are responsible for carrying out the policies of the Iranian government, among them state support for terrorism.  The IMDAFL, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY  10017, or

through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC 20007. The IMDAFL funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendants Hezbollah and al-Qaeda.

(f)    Iran's Ministry of Petroleum ("IMOP") is a political subdivision of the nation-state the Islamic Republic of Iran. This agency has core functions which are governmental, not commercial, in nature. This agency was established by law, its head is appointed by the president subject to confirmation by the parliament, its budget is proposed by the president and approved by the parliament, and its funding comes almost entirely from general tax revenues. All Iranian government ministries are responsible for carrying out the policies of the Iranian government, among them state support for terrorism. The affiliated entities of IMOP are the Defendant National Iranian Gas Company, Defendant National Iranian Petrochemical Company and the Iranian Offshore Oil Company. IMOP maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC 20007. IMOP, in conjunction with and through these affiliated entities, generates substantial money that is used by the Iranian government to fund its terrorist activities, including its support of Defendants Hezbollah and al-Qaeda.

### The Agency & Instrumentality Defendants

26.    The following agencies and instrumentalities of the Islamic Republic of Iran are named as Defendants in this action:

(a)    The Central Bank of the Islamic Republic of Iran, *aka* Bank Markazi ("CBI") is a financial institution owned and controlled by the Iranian government.

The main offices of the CBI are located at 144, Mirdamad Blvd., Tehran, Iran 11369 and Ministry of Foreign Affairs, Imam Khomeini Street, Tehran, Iran 11369. The CBI, as a government-controlled entity, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC 20007. CBI keeps accounts for, grants loans to and otherwise funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendants Hezbollah and al-Qaeda.

(b)    National Iranian Oil Company ("NIOC") is an Iranian company owned and controlled by the Iranian government located at the National Iranian Oil Company Building, Hafez Crossing, Taleghani Avenue, Tehran, Iran 11369. NIOC, as a government controlled entity, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC 20007. NIOC funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendants Hezbollah and al-Qaeda.

(c)    National Iranian Tanker Company ("NITC") is an Iranian company owned and controlled by the Iranian government located at 65 Shahid Atefi Street, Africa Expressway, Tehran, Iran 11369. NITC, as a government-controlled entity, maintains a presence in the United States through the Permanent Representative of

the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor,

New York, NY 10017, or through the Iranian Interest Section c/o the Embassy of

Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC 20007. NITC funnels

funds to the Iranian government with knowledge that the Iranian government uses

those funds to support its own terrorist activities as well as those of Defendants

Hezbollah and al-Qaeda.

(d)     National Iranian Gas Company ("NIGC") is an Iranian company

owned and controlled by the Iranian government located at National Iranian Gas

Company Building, South Aban Street, Karimkhan Boulevard, Tehran, Iran 11369. The

NIGC, as a government controlled entity, maintains a presence in the United States

through the Permanent Representative of the Islamic State of Iran to the United

Nations, 360 Lexington Avenue, 11th Floor, New York, NY 10017, or through the

Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW,

Washington, DC 20007. The NIGC funnels funds to the Iranian government with

knowledge that the Iranian government uses those funds to support its own terrorist

activities as well as those of Defendants Hezbollah and al-Qaeda.

(e)     National Iranian Petrochemical Company ("NIPC") is an Iranian

company owned and controlled by the Iranian government located at 144, North,

Sheikh Bahaie Avenue, P.O. Box 19395-6896, Tehran, Iran 11369. The NIPC, as a

government-controlled entity, maintains a presence in the United States through the

Permanent Representative of the Islamic State of Iran to the United Nations, 360

Lexington Avenue, 11th Floor, New York, NY 10017, or through the Iranian Interest

Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC 20007. NIPC funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendants Hezbollah and al-Qaeda.

(f)     The Airline of the Islamic Republic of Iran, *aka* Iran Air ("Iran Air") is an Iranian company owned and controlled by the Iranian government located at Iran Air H.Q., Mehrabad Airport, P.O. Box 13185-775, Tehran, Iran 11369. Iran Air, as a government-controlled entity, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC 20007. Iran Air funnels funds to the Iranian government with knowledge that the Iranian government uses those funds to support its own terrorist activities as well as those of Defendants Hezbollah and al-Qaeda. In addition, Iran Air knowingly assists Iran's efforts to export terrorism by transporting individual terrorists to destinations for the purpose of committing terrorist acts in foreign countries.

(g)     Hezbollah (alternatively spelled "Hizballah") is a surrogate of Iran's MOIS through which the Iranian government executes many of its terrorist plans. The goal of Hezbollah was to bring the ideals of the Islamic Revolution in Iran to Lebanon. Hezbollah is funded, directed and controlled by the Iranian government. President Clinton issued Executive Order 12947 on January 23, 1997, which named Hezbollah a Specially Designated Terrorist, along with eleven (11) other organizations which had committed, or posed a significant risk of committing, acts of violence which threatened to disrupt the

16

Middle East peace process. *See* 60 Fed. Reg. 5079 (Jan. 23, 1997). On October 8, 1997, the U.S. Department of State further designated Hezbollah as a Foreign Terrorist Organization pursuant to the Immigration and Nationality Act, 8 U.S.C. § 1189. *See* 62 Fed. Reg. 52650 (Oct. 8, 1997). A Foreign Terrorist Organization is one that engages in terrorist activity, retains the capability and intent to engage in terrorist activity, and whose terrorist activity threatens the security of U.S. nationals or the United States. In the wake of the attacks of September 11, 2001, which are the basis of this Second Amended Complaint, President Bush issued Executive Order 13224, which identified twelve (12) individuals and fifteen (15) entities which were a continuing and immediate threat to the security of U.S. nationals and the United States. *See* 66 Fed. Reg. 49079 (Sept. 23, 2001). Pursuant to this Order, the U.S. Department of State listed Hezbollah as a Specially Designated Global Terrorist. *See* Fed. Reg. 12633 (Mar. 19, 2002). Hezbollah, as a government agency, maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC 20007, or through the Permanent Representative of Lebanon to the United Nations, 866 United Nations Plaza, Room 531-533, New York, NY 10017.

27.    At all relevant times, Iran used the Agency and Instrumentality Defendants to further its funding and support of terrorist activities against the United States and its citizens, including its support for Defendants Hezbollah and al-Qaeda.

## **FACTUAL BACKGROUND**

### *Background of al-Qaeda*

28.    In or about 1989, Osama bin Laden, Muhammad Atef and others founded an

international terrorist group that became known as al-Qaeda ("the Base").  Osama bin Laden was the "emir" (prince) of al-Qaeda and was its leader at all relevant times.  Members of al-Qaeda pledged an oath of allegiance (called a "*bayat*") to Osama bin Laden and al-Qaeda.

29.     From 1989 until about 1991, al-Qaeda was headquartered in the Islamic Emirate of Afghanistan and Peshawar, Pakistan.  In or about 1991, the leadership of al-Qaeda, including its emir, Osama bin Laden, relocated to the Sudan.  Al-Qaeda was headquartered in the Sudan from approximately 1991 until approximately 1996 but also maintained a presence and activities in various parts of the world.  In 1996, Osama bin Laden and other members of al-Qaeda relocated again to the Islamic Emirate of Afghanistan.

30.     Bin Laden and al-Qaeda violently opposed the United States for several reasons. First, the United States was regarded as an "infidel nation" because it was not governed in a manner consistent with the group's extremist interpretation of Islam.  Second, the United States was viewed as providing essential support for other "infidel" governments and institutions. Third, al-Qaeda opposed the involvement of the United States armed forces in the Gulf War in 1991 and in Operation Restore Hope in Somalia in 1992 and 1993. In particular, al-Qaeda opposed the continued presence of American military forces in Saudi Arabia (and elsewhere on the Arabian Peninsula) following the Gulf War.  Fourth, al-Qaeda opposed the United States Government because of the arrest, conviction and imprisonment of persons belonging to al- Qaeda or its affiliated terrorist groups or those with whom it worked. For these and other reasons, bin Laden declared jihad, or holy war, against the United States, which he carried out through al-Qaeda and its affiliated organizations.

31.     At relevant times, al-Qaeda functioned both on its own and through terrorist organizations that operated under its umbrella, including Egyptian Islamic Jihad, which was led by Ayman al-Zawahiri, the Islamic Group (also known as "*el Gamaa el Islamia*" or simply

"*Gamaa't*"), and a number of jihad groups in other countries, including the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, the Kashmiri region of India and the Chechnyan region of Russia.  Al-Qaeda also maintained cells and personnel in a number of countries to facilitate its activities, including Kenya, Tanzania, the United Kingdom, Germany, Canada, Malaysia, and the United States.

32.     Al-Qaeda had a command and control structure which included a "*majlis al shura*" (or consultation council) which discussed and approved major undertakings, including terrorist operations.  Al-Qaeda also had a "military committee" which considered and approved "military" matters.

33.     Bin Laden and al-Qaeda forged alliances with representatives of the government of Iran, and its associated terrorist group Hezbollah, for the purpose of working together against their perceived common enemy in the West, the United States.

34.     At relevant times, bin Laden and al-Qaeda sponsored, managed, and/or financially supported training camps in Afghanistan.  Those camps were used to instruct members and associates of al-Qaeda and its affiliated terrorist groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction. In addition to providing training in the use of various weapons, these camps were used to conduct operational planning against United States targets around the world and experiments in the use of chemical and biological weapons.  These camps were also used to train al-Qaeda members in security and counterintelligence methods, such as the use of codes and passwords, and to teach members and associates of al-Qaeda about traveling to perform operations. For example, al-Qaeda instructed its members and associates to dress in "Western" attire and to use other methods to avoid detection by security officials. The group also taught its members and associates to monitor media reports of its operations to

determine the effectiveness of their terrorist activities.

35.     During the time from about 1996 when al-Qaeda operated from its headquarters in Afghanistan, bin Laden and al-Qaeda forged close relations with the ruling regime, known as the "Taliban," and Taliban leader Muhammad Omar.  Bin Laden openly informed other al-Qaeda members and associates outside Afghanistan of their support of, and alliance with, the Taliban and Omar.

36.      One of the principal goals of al-Qaeda was to drive the United States armed forces out of Saudi Arabia (and elsewhere on the Arabian Peninsula) and Somalia by violence. These goals eventually evolved into a declaration of jihad (holy war) against America and all Americans. Members of al-Qaeda issued fatwahs (rulings on Islamic law) indicating that such attacks on Americans were both proper and necessary.

37.     Like Iran, al-Qaeda and bin Laden used terrorism as an instrument of policy, as a tool to be used to further political objectives.  Al-Qaeda has, over the years, directly carried out murders, bombings and other terrorist acts against its enemies.  It has also provided direct and indirect support to other international terrorist groups and received support in return, often in the form of money, training, sanctuary, documentation, intelligence, weapons and other types of assistance.

38.     Al-Qaeda has often used operatives such as the hijackers to actively engage in terrorist activities against the United States and its citizens.  In conducting those terrorist activities, al-Qaeda received financial, logistical and other material support from Iran other foreign states.

### *Iran's Sponsorship of Terrorism and al-Qaeda*

39.     For many years, the Department of State has included Iran among the state sponsors of terrorism.  Indeed, the Department of State has repeatedly described Iran as "the most active" state sponsor of terrorism.

40.     At relevant times, Iran provided material support to bin Laden and al-Qaeda, often through Iran's state-sponsored terrorist organization, Hezbollah.  That support included advice and assistance in planning attacks against American targets, as well as financial and logistical support for particular operations such as the 9/11 attacks.

41.     Imad Fayez Mughniyah (aka Hajj Radwan) was, for decades prior to his death in February 2008, the terrorist operations chief of Hizballah.  Mughniyah was, since the early 1980s, affiliated with the Islamic regime in Iran, and he lived in Iran for many years.  Imad Mughniyah was an agent of the Iranian regime.  Imad Mughniyah had a direct reporting relationship to Iranian intelligence and a direct role in Iran's sponsorship of terrorist activities.

42.     While Osama bin Laden and al-Qaeda were headquartered in Sudan in the early 1990s, Hassan al Turabi fostered the creation of a foundation and alliance for combined Sunni and Shi'a Muslim opposition to the United States and the West, an effort that was agreed to and joined by Osama bin Laden and Ayman al Zawahiri, leaders of al-Qaeda, and by the leadership of Iran.

43.     The well-known historical religious division between Sunni and Shi'a Muslims did not pose an insurmountable barrier to cooperation in regard to terrorist operations by radical Islamic leaders and terrorists.  Iran, which is largely Shiite, and its terrorist proxy organization, Hizballah, also Shiite, entered into an alliance with al-Qaeda, which is Sunni, to work together to conduct terrorist operations against the United States during the 1990s and continuing through, and after, September 11, 2001.

44.     In 1991 or 1992, discussions in Sudan between al-Qaeda and Iranian operatives led to an agreement to cooperate in providing support for actions carried out primarily against Israel and the United States.  Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives.  Osama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hezbollah.

45.    On October 31, 1991, Iran hosted the International Conference for the Support of the Muslim Palestinian People's Revolution, which was attended by radical Palestinian groups, both Islamic and secular.  The conference established a permanent secretariat, funded by Iran, to coordinate pro-intifada activities.  In doing so, Iran tightened its ties to the radical groups Palestinian HAMAS and Islamic Jihad.

46.    At various times in or about 1992 and 1996, bin Laden and other ranking members of al-Qaeda made it known that they favored a policy under which al-Qaeda would put aside its differences with Shiite Muslim terrorist organizations, including the government of Iran and its affiliated terrorist group Hezbollah, in order to coordinate attacks against their perceived common enemy, the United States.

47.    On or before 1994, al-Qaeda forged an alliance with the National Islamic Front of Sudan and with representatives of the government of Iran, and its associated terrorist group Hezbollah, for the purpose of working together against the United States and other perceived common targets.

48.    Hezbollah is financed by the Iranian government.  The amounts of Iranian government contributions to Hezbollah have varied over the years, ranging from an estimated 15-20 million dollars annually, to as much as 150-300 million dollars annually.  Sheikh Subhi al-Tufeili, Hezbollah's first leader, stated:

> To deny the Iranian connection to Lebanon's Hezbollah would be like denying that the sun provides light to the earth.  Who can deny such a thing?

49.    Hezbollah's manifesto, as declared by Hezbollah's spokesman, Sheikh Ibrahim al-Amin states:

> We, the sons of Hezbollah's Nation in Lebanon, whose vanguard God has given victory in Iran and which has established the nucleus of the world's central Islamic state, abide by the orders of

a single wise and just command currently embodied in the supreme examples of Ayatollah Khomeini.

From this basis, we in Lebanon are not a closed organizational structural party, nor are we a narrow political framework, but we are a nation interconnecting with all Muslims of the World. We are linked by a strong ideological and political connection - Islam.

From here what befalls the Muslims in Afghanistan, Iraq, the Philippines or anywhere else verily afflicts the body of our own Islamic nation of which we are an inseparable part, and moved to confront it on the basis of our main legal obligation in light of the political view decided by our leader Wilayat al-Faqih [Ayatollah Khomeini].

50.     In 1993, in a meeting in Khartoum, Sudan, arranged by Ali Mohamed, a confessed al Qaeda terrorist and trainer now in a U.S. prison, Osama bin Laden and Ayman al Zawahiri met directly with Iran's master terrorist Imad Mughniyah and Iranian officials, including IRGC Brigadier General Mohammad Baqr Zolqadr, a highly placed member of the Iranian terrorism apparatus.  At the 1993 Khartoum conference, representatives of Iran, Hezbollah, and al Qaeda worked out an alliance of joint cooperation and support on terrorism.  Ali Mohamed, who was charged with the 1998 bombing of the two United States Embassies in Africa, testified as follows during his guilty plea hearing on October 20, 2000:

I was aware of certain contacts between al-Qaeda and al Jihad organization, on one side, and Iran and Hezbollah on the other side.  I arranged security for a meeting in the Sudan between Mughaniyah, Hezbollah's chief, and bin Laden.  Hezbollah provided explosives training for al-Qaeda and al Jihad.  Iran supplied Egyptian Jihad with weapons.  Iran also used Hezbollah to supply explosives that were disguised to look like rocks.

51.     The 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran and Hezbollah and al- Qaeda.  Osama bin Laden sent more terrorist operatives to Hezbollah training camps operated by Imad Mughniyah and the IRGC in Lebanon and Iran.   Among other tactics, Hezbollah taught bin Laden's al-Qaeda operatives how to bomb large buildings, and Hezbollah also gave the al-Qaeda operatives training

23

in intelligence and security.

52.    Throughout the 1990s, the al-Qaeda/Iran/Hezbollah terrorist training arrangement continued.  Imad Mughniyah himself coordinated these training activities, including training of al-Qaeda personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon.

53.    As a result of the creation of this terrorist alliance, al-Qaeda's Ayman al Zawahiri repeatedly visited Tehran during the 1990s and met with officers of MOIS, including chief Ali Fallahian, and Qods Force chief Ahmad Vahidi.

54.    At all times, Iran's Supreme Leader, Ayatollah Khamenei, was fully aware that Iran and Hezbollah was training foreign terrorists.

55.    On June 7, 1996, Iran's spiritual leader, Ayatollah Ali Khamenei, declared that Hezbollah must reach "all continents and all countries."

56.    In early June of 1996, Iran organized a pan-Islamist summit which had a primary objective of establishing an international coordination committee to oversee anticipated escalation in hostilities.  Ayatollah Ahmad Jannati, a close associate of Ayatollah Khamenei, emerged as the spokesperson for the working group.  The meeting was organized jointly by the Supreme Council for Intelligence Affairs and IRCG high command.  Attending the working group were the following:  Ramadan Shallah (head of the Palestine Islamic Jihad); Ahmad Salah, *a.k.a.* Mamdouh Mahmoud Salim (Egyptian Islamic Jihad); Imad Mughniyah (Hezbollah); Muhammad Ali Ahmad (a representative of al-Qaeda and Osama Bin Laden); Ahmad Jibril (head of the Popular Front for the Liberation of Palestine-General Command); Imad al-Alami and Mustafa al-Liddawi (HAMAS); and Abdullah Ocalan (Kurdish People Party).  The summit participants agreed on the unification of their financial system and training.

57.    In or about July 1996, Osama bin Laden met with an Iranian intelligence official in

Afghanistan.

58.     In early October 1996, bin Laden visited Tehran for consultations.  One of the issues addressed was the unification of various Egyptian terrorist organizations.  Iranian intelligence Minister Ali Fallahian chaired the meeting with representatives from the Iranian Interior Ministry, Islamic Guidance Ministry, and Foreign Ministry.  Among the Egyptians attending were the Tehran-based aide of defendant Ayman al Zawahiri, Kamal Ujayzah, and Mustafa Hamzah.  The Iranians discussed specific long-term operational plans and explained to the Egyptian attendees that the degree of Iran's support depended on the extent of their unity.  The Egyptian attendees agreed to form a unified command with Osama bin Laden for operational purposes.

59.     In or about mid-September 1997, the Iranian leadership met to discuss the new course of the anti-American struggle.  The participants included Iran's supreme and spiritual leader Ayatollah Ali Khamenei.  Also present were newly-elected president Mohammad Khatami, former president Ali Akbar Hashemi-Rafsanjani, and the minister of intelligence, Qurban Ali Dari Najafabadi.  Other participants in this conference were: General Rahim Safavi (the Commander-in-Chief of the IRGC); General Mohsen Rezai (former Commander-in-Chief of IRGC, later responsible for reorganizing the Iranian security services and their networks); Ali Fallahian (former intelligence minister); Mohammed Mohammadi Rayshahri (former intelligence minister, present as Khamenei's special adviser on intelligence affairs); Hossein Sheikh-ol-Islam (Iran's former deputy foreign minister and once again director on the Office of Liberation Movements); Ali Akbar Mohtashemi; General Diya Sayfi (the commander of the IRGC forces in Lebanon); members of the Supreme National Security Council; and senior IRGC and intelligence officials.

60.     In or about September 20-23, 1997, Iranian intelligence organized a major summit of terrorist leaders from all over the world.  Among the participants were:  Imad Mughniyah and

Abdul-Hadi Hammadi (Hezbollah); Ayman al-Zawahiri (Egyptian Islamic Jihad); Ahmad Jibril (chief of the Popular Front for the Liberation of Palestine-General Command PFLP-GC); Osama Abu-Hamden and Imad al-Alami (HAMAS); Ramadan al-Shallah (chief of Palestinian Islamic Jihad); and three commanders representing branches of Hezbollah in the Persian Gulf States.

61.     Participants at the summit examined the Islamists' ability to escalate terrorism against the United States and the West.  Several senior Iranian officials addressed the summit and ordered the terrorist leaders to be ready to launch an unprecedented international terrorist campaign.

62.     In or about late September 1997, the Iranian leadership met again to discuss the course of the forthcoming terrorism offensive in light of the resolutions and findings of the recent international terrorist summit.

63.     In the second half of November 1997, Ayatollah Ali Khamenei convened a meeting with General Rahim Safavi and Ahmad Vahidi, the former commander of al-Quds Forces, to discuss the establishment of a new elite terrorist force to carry out spectacular, but deniable, terrorist strikes against the United States and the West.

64.     Al-Qaeda telephone bills of international calls between 1996 and 1998 were analyzed by United States investigators, showing that nearly 10% of the outgoing calls from Afghanistan went to Iran.

65.     The creation of the Iran/Hezbollah/al-Qaeda terrorist alliance, which began in the early 1990s, and during which Hezbollah terror chief Imad Mughniyah oversaw the training activities of members of various terrorist groups until his death in 2008, resulted in a string of deadly terrorist strikes aimed directly at the U.S. and its allies.  Among these terrorist attacks were the following: in March 1992, a Hezbollah terrorist team operating under Mughniyah's command truck-bombed the Israeli embassy in Buenos Aires, Argentina; on February 26, 1993, the first

World Trade Center bombing by al-Qaeda operatives occurred; a few months later, an al-Qaeda conspiracy to bomb several New York City landmarks, including the Lincoln Tunnel and the Holland Tunnel, was disrupted; in July 1994, Imad Mughniyah and a Hezbollah team, under the direction of Iran, MOIS, and the IRGC, truck bombed the *Asociación Mutual Israelita Argentina* ("AMIA"), the Jewish cultural center in Buenos Aires; in December 1994, Algerian terrorists associated with al Qaeda hijacked a French airliner, intending to crash it into the Eiffel Tower in Paris, a precursor to 9/11; on July 7, 1995, Ayman al Zawahiri's Egyptian gunmen, supported, trained, and funded by Iran, attempted to assassinate Egyptian President Hosni Mubarak near Addis Ababa, Ethiopia; on June 25, 1996, Saudi Hezbollah terrorists, acting on directions from Iran and under planning by the IRGC Qods Force commander, and with assistance from al-Qaeda, truck bombed the Khobar Towers housing complex in Dhahran, Saudi Arabia, where U.S. military servicemen were quartered; on August 7, 1998, two nearly simultaneous truck bombings, carried out by al- Qaeda under the direction Iran, MOIS, and the IRGC, and with training by Hezbollah, destroyed the U.S. embassies in Nairobi, Kenya, and Dar-es-Salaam, Tanzania; on October 12, 2000, al- Qaeda suicide bombers attacked the U.S.S. Cole in the harbor of Aden, Yemen.

66.    According to the State Department's *Patterns of Global Terrorism 2000*, Iran remained the most active state sponsor of terrorism in 2000. It provided increasing support to numerous terrorist groups, including the Lebanese Hezbollah, HAMAS, and the Palestine Islamic Jihad (PIJ), which seek to undermine the Middle East peace negotiations through the use of terrorism.

67.    The State Department's *Patterns of Global Terrorism 2000* also stated that Iran's "Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved in the planning and execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals."

68.     In January 2001, Dr. Ayman al-Zawahri and other al-Qaeda leaders met with Iranian intelligence officials near the town of Varamin, just south of Tehran.

69.     The Iranian delegation was headed by Hojjat-ol eslam Ali Akbar Nateq-Nouri and included Imad Fayez Mugniyeh, the Lebanese operative and leader of Hezbollah who is credited with numerous terrorist attacks on Americans.  The purpose of the meeting was to plan and coordinate Iranian support for an upcoming al-Qaeda operation against the United States.

70.     On May 4, 2001, a second planning meeting between al-Qaeda and Iranian intelligence officials was held in Iran.  Attendees at this planning meeting included Khamenei, Rafsanjani, and bin Laden's son, Sa'ad bin Laden.  Iranian intelligence memos written in the weeks following the meeting advise Iranian operatives to be prepared for U.S. retaliation for an attack planned for September 2001.

### The September 11 Terrorist Attacks

71.     During the mid-to-late 1980s, Iran began formulating contingency plans for asymmetrical or unconventional warfare against the United States, including terrorist operations.  These contingency plans were code-named "*Shaitan dar Atash*."

72.     One of the "*Shaitan dar Atash*" contingency plans was for the hijacking of U.S. commercial airliners and crashing them into buildings, particularly in New York City and Washington, D.C.  This contingency plan became the blueprint for the 9/11 attacks.

73.     Defendants Iran and Hezbollah had actual foreknowledge of, and were complicit in the planning and coordination of the 9/11 attacks upon the United States which were carried out by members of defendant al-Qaeda under the direction of Osama bin Laden.

74.     In the mid-1990s, when the Iran/Hezbollah/al-Qaeda terror alliance was forming, al Qaeda operative Mustafa Hamid had "negotiated a secret relationship with Iran that allowed safe transit via Iran to Afghanistan."  This safe Iran-Afghanistan passageway was managed by

defendant MOIS.

75.    In 2000, Iran facilitated the international travel of al-Qaeda's operatives between October 2000 and February 2001, including travel of at least eight (8) of the 9/11 hijackers from Iran into Afghanistan, where bin Laden's training camps were located, and where the 9/11 hijackers trained for the 9/11 operation.  Iran thus provided essential material and direct support for the 9/11 attacks.

76.    The Iranian government materially and directly supported the 9/11 terrorist travel operation was by ordering its border inspectors not to place telltale Iranian stamps in the passports of these future hijackers traveling to and from Afghanistan via Iran.  Eight to fourteen of the 9/11 hijackers transited Iran on their way to or from Afghanistan, and Iranian border inspectors did not stamp their Saudi passports.  The Iranians were aware they were helping operatives who were part of an organization preparing attacks against the United States.  The actions of Iranian border authorities in refraining from stamping the passports of the Saudi hijackers, vastly increased the likelihood of the operational success of the 9/11 plot.

77.    A terrorist agent of Iran and Hezbollah also helped to coordinate other international travel by the 9/11 hijackers.  In October 2000, Imad Mughiyah, the Hezbollah terrorist commander, visited Saudi Arabia to coordinate future 9/11 hijacker activities there and assisted them in traveling on to Iran during November 2000.  During this time period, on their travels into and out of Iran, and through Beirut, Lebanon, some of the 9/11 hijackers were accompanied by Mughniyah or his Hezbollah associate.

78.    The actions of Imad Mughniyah, and his Hezbollah associate(s), in escorting 9/11 hijackers on flights to and from Iran, and coordinating passport and visa acquisition activities in Saudi Arabia constituted direct and material support for the 9/11 conspiracy.

79.    Prior to September 11, 2001, al-Qaeda, with the aid, assistance and support of

Defendants, planned, funded and coordinated an attack upon American citizens. On September 11, 2001, nineteen al-Qaeda operatives carried out that heinous attack by hijacking four airliners laden with jet fuel and causing them to crash into the World Trade Center Towers, the Pentagon Building and a field in Shanksville, Pennsylvania.

80.    On September 11, 2001, five of the al-Qaeda hijackers - Mohammed Atta, Abdul Alomari, Wail al-Shehri, Waleed al-Shehri, and Satam al-Suqami, hijacked American Airlines Flight 11 carrying ninety-two (92) persons, bound from Boston to Los Angeles, and crashed it into the North Tower of the World Trade Center in New York at approximately 8:46 a.m., causing the collapse of the tower and resulting in the deaths of the 9/11 Decedents.

81.    On September 11, 2001, five al-Qaeda hijackers - Marwan al-Shehhi, Fayez Ahmed, *aka* "Banihammad Fayez," Ahmed al-Ghamdi, Hamza al-Ghamdi, and Mohand al-Shehri - hijacked United Airlines Flight 175 carrying sixty-five (65) persons, bound from Boston to Los Angeles, and crashed it into the South Tower of the World Trade Center in New York at approximately 9:02 a.m., causing the collapse of the tower and resulting in the deaths of the 9/11 Decedents.

82.    On September 11, 2001, five al-Qaeda hijackers - Khalid al-Midhar, Nawaf al-Hazmi, Hani Hanjour, Salem al-Hamzi, and Majed Moqed - hijacked American Airlines Flight 77 carrying sixty-four (64) persons, bound from Virginia to Los Angeles, and crashed it into the Pentagon Building in Arlington County, Virginia at approximately 9:37 a.m., causing the deaths of the 9/11 Decedents.

83.    On September 11, 2001, four of the al-Qaeda hijackers - Ziad Jarrah, Ahmed al-Haznawi, Saaed al-Ghamdi, and Ahmed al-Nami - hijacked United Airlines Flight 93 carrying forty-five (45) persons, bound from Newark to San Francisco, and caused it to crash in a field near the town of Shanksville, Pennsylvania at approximately 10:10 a.m., causing the deaths of the 9/11

Decedents.

84.    The September 11 terrorist hijackings and attacks referenced above resulted in the murder of the 2,976 Decedents.  The hijackers used box cutters and knives to commit air piracy and murder on behalf of al-Qaeda. They were assisted in their terrorist campaign by Defendants.

### *Iran's Support of al-Qaeda After the 9/11 Attacks*

85.    The Defendants continued to support al-Qaeda after the September 11 attacks.  Iran provided material support to al-Qaeda after the 9/11 attacks by providing safe haven to al-Qaeda leaders and operatives, keeping them safe from retaliation by U.S. forces, which invaded Afghanistan.

86.    Former Secretary of Defense Donald Rumsfeld stated on February 3, 2002, "We have any number of reports that Iran has been permissive and allowed transit through their country of al-Qaeda." On February 4, 2002, Rumsfeld elaborated:  "We do have a good deal of information to the effect that al-Qaeda and the Taliban have taken refuge there and others have used it as a transit point.  We have no evidence at all that Iran has tried to stop them, that Iran has tried to turn them over to us or some other country or to incarcerate these people, the al-Qaeda, a terrorist network."

87.    In the late 1990s, al-Qaeda operative Mustafa Hamid had passed communications between Osama bin Laden and the Government of Iran.  In late 2001, while in Tehran, Hamid negotiated with the Iranians to relocate al-Qaeda operatives and their families to Iran after the 9/11 attacks.

88.    Pursuant to these negotiations, Iran facilitated the exit from Afghanistan, and into Iran, of numerous al Qaeda leaders, operatives, and their families when the United States-led multi-national coalition attacked the Taliban regime in Afghanistan in the fall of 2001. The Iran-Afghanistan safe passageway, established earlier to get al-Qaeda recruits into and out of the

training camps in Afghanistan, was utilized to evacuate hundreds of al-Qaeda fighters and their families from Afghanistan into Iran for safe haven there. The IRGC knew of, and facilitated, the border crossings of these al-Qaeda fighters and their families entering Iran.

89. Among the high-level al-Qaeda officials who arrived in Iran from Afghanistan at this time were Sa'ad bin Laden, a son of Osama bin Laden, and the man who would soon lead "al-Qaeda in Iraq," Abu Mussab Zarqawi. As the leader of al-Qaeda in Iraq, Zarqawi was responsible for a series of bombings, beheadings, and other attacks before being killed by U.S. forces in June 2006.

90. The No. 2 official of al-Qaeda, Ayman al Zawahiri, made particular arrangements for his own family's safe haven in Iran after 9/11, with the aid of his son-in-law Muhammad Rab'a al Sayid al Bahtiyti, an Egyptian-born al-Qaeda operative.

91. In late 2001, Sa'ad bin Laden facilitated the travel of bin Laden family members from Afghanistan to Iran. Thereafter, Sa'ad bin Laden made key decisions for al-Qaeda and was part of a small group of al Qaeda members involved in managing al-Qaeda from Iran.

92. During the months and years after September 11, 2001, Defendants Iran, the IRGC, and MOIS continued to provide substantial direct and material support to the al-Qaeda leaders, operatives, and their families inside Iran, which provided for their needs and shelter and maintaining their safety from American and U.S.-led coalition military forces in Afghanistan.

93. Since 2001, there have been numerous instances of al-Qaeda operatives and leaders meeting, planning, and directing international terrorist operations from the safety of Iranian territory. Senior al-Qaeda members continued to conduct terrorist operations from inside Iran. The U.S. intercepted communications from Saef al Adel, then in Mashad, Iran, to al-Qaeda assassination teams in Saudi Arabia just before their May 12, 2003 assault on three housing compounds in Riyadh. Al-Qaeda leaders in Iran planned and ordered the Riyadh attack.

94.    On July 28, 2011, the U.S. Treasury Department designated a node of the al-Qaeda terror network based inside Iran, freezing all of its financial assets under U.S. jurisdiction and prohibiting any transactions with its identified operatives. The Treasury Department stated that some members of the network are based outside of Iran, but funnel recruits and cash through Iran "under an agreement between al-Qaeda and the Iranian government."

95.    One member of this network is Atiyah Abd al-Rahman ("Rahman"). The documents captured in the safe house occupied by Osama bin Laden at the time of his capture identify Rahman as bin Laden's top deputy.  According to the Treasury Department, Rahman is al-Qaeda's "overall commander in Pakistan's tribal areas and as of late 2010, the leader of al-Qaeda in North and South Waziristan, Pakistan." The Treasury Department adds: "Rahman was previously appointed by Osama bin Laden to serve as al-Qaeda's emissary in Iran, a position which allowed him to travel in and out of Iran with the permission of Iranian officials."  For several years after 9/11, Rahman was protected by the Iranian regime. He is one of the senior al-Qaeda leaders supposedly held under a loose form of "house arrest" in Iran.

96.    The Iran-based al-Qaeda network is headed by another terrorist, Ezedin Abdel Aziz Khalil (aka Yasin al Suri). The Treasury Department's designation notes that "Iranian authorities maintain a relationship with Khalil and have permitted him to operate within Iran's borders." Khalil's activities include moving "money and recruits from across the Middle East into Iran, then on to Pakistan," where they serve senior al-Qaeda leaders.

97.    According to David S. Cohen, then the Under Secretary of Treasury for Terrorism and Financial Intelligence, "There is an agreement between the Iranian government and al-Qaeda to allow this network to operate.  There's no dispute in the intelligence community on this."

### Defendants Are Liable to Plaintiffs for Their Material Support of al-Qaeda

98.    The Defendants instructed, trained, directed, financed and otherwise supported and

assisted al-Qaeda, or conspired in the instruction, training, direction, financing, and support of al-Qaeda, in connection with al-Qaeda's terrorist plans.  In furtherance of those plans, the al-Qaeda hijackers deliberately caused planes to crash into the World Trade Center Towers, the Pentagon and a field in Shanksville, Pennsylvania on September 11, 2001.

99.    As a direct and proximate result of the intentional, willful, reckless, and careless actions of Defendants, all Plaintiffs have suffered severe and permanent personal injuries, damages, and losses, including the following:

(a)    Decedents' fear of death prior to the crash into and collapse of the World Trade Center Towers, the crash into the Pentagon and the crash of United Airlines flight 93;

(b)    the severe mental anguish suffered by the Decedents and all Plaintiffs;

(c)    the severe pain and suffering suffered by the Decedents and all Plaintiffs;

(d)    the inability of all Decedents to perform the usual household and personal activities that they normally would have performed through the remainder of their natural life expectancies;

(e)    loss of Decedents' earnings and future earning potential;

(f)    loss of Decedents' life and life's pleasures;

(g)    loss of consortium, solatium and/or companionship;

(h)    costs relating to managing the estates of all Decedents; and

(i)    death of the Decedents by way of murder as a result of the Defendants' conduct and that of their co-conspirators.

100.    The aforementioned deaths, personal injuries and losses experienced by the Plaintiffs were caused by the intentional, outrageous, reckless, and careless acts of Defendants, acting individually and in concert, and of their agents, servants, employees, agencies and instrumentalities, acting within and during the course and scope of their employment, authority, or apparent authority.

## CLAIMS

### COUNT ONE

### *CLAIMS BY PLAINTIFFS AGAINST*
### *DEFENDANTS UNDER SECTION 1605A*
### *FOREIGN SOVEREIGN IMMUNITIES ACT*
### *28 U.S.C. § 1605A*

101.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

102.    At all relevant times, Defendant Iran was designated as a state sponsor of terrorism as required by § 1605A(a)(2)(A)(i)(I) in order to maintain an action under § 1605A of the Federal Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

103.    The conduct of the Al Qaeda hijackers constituted acts of extrajudicial killing and torture within the meaning of FSIA § 1605A(a)(1).

104.    Iran and the Instrumentality Defendants provided material support and resources to al-Qaeda in furtherance of the murderous acts of the al-Qaeda hijackers.

105.    At all relevant times, al-Qaeda and the hijackers were agents of Iran acting within the scope of their agency.

106.    The conduct of all Defendants violated the provisions of the FSIA, in particular 28 U.S.C. § 1605A, and all Plaintiffs suffered damages as a result of that violation.

107.    Plaintiffs, as family members of certain 9/11 Decedents, are entitled to recover damages from all Defendants under the provisions of the FSIA.

108.    The injuries and damages suffered by the Plaintiffs by virtue of the death the 9/11 Decedents, and the consequences resulting there from, were proximately caused by the intentional and reckless acts of Defendants as described herein.

109.    As a direct and proximate result of the deaths of the 9/11 Decedents, Plaintiffs have been deprived of future aid, assistance, services, comfort, and financial support.

110.    As a direct and proximate result of the Defendants' cowardly, barbaric and outrageous acts of murder, Plaintiffs will forever grieve the deaths of the 9/11 Decedents.

111.    As a further result of intentional and reckless acts of Defendants, Plaintiffs have been caused to expend various sums to administer the Estates of the 9/11 Decedents and have incurred other expenses for which they are entitled to recover.

112.    As a result of Defendants' murderous conduct, the 9/11 Decedents suffered damages including pain and suffering, trauma, emotional distress, loss of life and life's pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully set forth in the paragraphs above which are incorporated herein by reference.

113.    As a result of the intentional, reckless and negligent acts of the Defendants as described above, the 9/11 Decedents were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their deaths.

114.    The actions of the Defendants, acting in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, and reckless disregard of the rights of the 9/11 Decedents and all Plaintiffs.  The Defendants, acting individually and jointly, intended to carry out actions that would end the lives of the Decedents.

115.    Plaintiffs are entitled to solatium and other damages, as stated in § 1605A(c)(4) of the FSIA, 28 U.S.C. § 1605A(c)(4).

116.    As a result of their intentional, malicious, outrageous, willful and wanton conduct, the Defendants are jointly and severally liable to all Plaintiffs for punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly,

severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory, punitive damages and solatium, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate.

**COUNT TWO**

***CLAIMS BY PLAINTIFFS AGAINST***
***DEFENDANTS UNDER SECTION 1605B***
***JUSTICE AGAINST SPONSORS OF TERRORISM ACT***
***28 U.S.C. § 1605B***

117.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

118.    The Justice Against Sponsors of Terrorism Act ("JASTA") abrogates foreign sovereign immunity in cases where money damages are sought against a foreign state in connection with an act of international terrorism which occurs in the United States. *See* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 3(b)(1), 130 Stat. 852, 854 (2016) (codified at 28 U.S.C. § 1605B(b)(1)).

119.    A plaintiff pursuing a claim under JASTA may also establish liability for tortious acts of a foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless of where the tortious act or acts of the foreign state occurred. *See* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 3(b)(2), 130 Stat. 852, 854 (2016) (codified at 28 U.S.C. § 1605B(b)(2)).

120.    The attacks of September 11, 2001, constitute an act of international terrorism that occurred in the United States and was planned by al-Qaeda in conjunction with Defendants as described herein.

121.    Plaintiffs, as estate representatives and family members of certain 9/11 Decedents, are entitled to recover damages from all Defendants under the provisions of JASTA.

122.    The injuries and damages suffered by the Plaintiffs by virtue of the death the 9/11

Decedents, and the consequences resulting there from, were proximately caused by the intentional and reckless acts of the Defendants as described herein.

123.    As a direct and proximate result of the deaths of the 9/11 Decedents, Plaintiffs have been deprived of future aid, assistance, services, comfort, and financial support.

124.    As a direct and proximate result of Defendants' cowardly, barbaric and outrageous acts of murder, Plaintiffs will forever grieve the deaths of the 9/11 Decedents.

125.    As a further result of intentional and reckless acts of the Defendants, Plaintiffs have been caused to expend various sums to administer the Estates of the 9/11 Decedents and have incurred other expenses for which they are entitled to recover.

126.    As a result of the Defendants' murderous conduct, the 9/11 Decedents suffered damages including pain and suffering, trauma, emotional distress, loss of life and life's pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully set forth in the paragraphs above which are incorporated herein by reference.

127.    As a result of the intentional, reckless and negligent acts of Defendants as described above, the 9/11 Decedents were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their deaths.

128.    The actions of Defendants, acting in concert with al-Qaeda to carry out their unlawful objectives, engaged in conduct that was malicious, outrageous and in willful, wanton, and reckless disregard of the rights of the 9/11 Decedents and all Plaintiffs.  Defendants, acting individually and jointly, intended to carry out actions that would end the lives of the Decedents.

129.    Plaintiffs are entitled to solatium and other damages.

130.    As a result of their intentional, malicious, outrageous, willful and wanton conduct, the Defendants are jointly and severally liable to all Plaintiffs for punitive damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly, severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory, punitive damages and solatium, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate.

### COUNT THREE

*CLAIMS BY PLAINTIFFS AGAINST*
*DEFENDANTS UNDER THE*
*JUSTICE AGAINST SPONSORS OF TERRORISM ACT*
*§ 4(a) AMENDING 18 U.S.C. § 2333*

131.    Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

132.    On October 8, 1999, al-Qaeda was designated as a Foreign Terrorist Organization under § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189.

133.    JASTA amends the Anti-Terrorism Act, 18 U.S.C. § 2333, by permitting a plaintiff to establish liability "as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." *See* Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 4(a), 130 Stat. 852, 854 (2016) (codified at 18 U.S.C. § 2333(d)(1)-(2)).

134.    The term "person" includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.  See 18 U.S.C. § 2333(d)(1); 1 U.S.C. § 1.

135.    Defendants, some of whom are corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals, as more fully described above, aided, abetted, and conspired with al-Qaeda to effectuate the terrorist attacks of September

11, 2001, and murder the 9/11 Decedents.

136.    As a direct result of Defendants aiding, abetting, and conspiring with al-Qaeda, Plaintiffs suffered damages.

137.    As a direct result of Defendants aiding, abetting, and conspiring with al-Qaeda to effectuate the murders of the 9/11 Decedents, Plaintiffs have been deprived of future aid, assistance, services, comfort, and financial support.

138.    As a direct result of Defendants aiding, abetting, and conspiring with al-Qaeda to effectuate the murders of the 9/11 Decedents, Plaintiffs will forever grieve the deaths of the 9/11 Decedents.

139.    As a direct result of Defendants aiding, abetting, and conspiring with al-Qaeda to effectuate the murders of the 9/11 Decedents, the 9/11 Decedents suffered damages including pain and suffering, trauma, emotional distress, loss of life and life's pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully set forth in the paragraphs above which are incorporated herein by reference.

140.    As a direct result of the Defendants aiding, abetting, and conspiring with al-Qaeda to effectuate the murders of the 9/11 Decedents, the 9/11 Decedents were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to their deaths.

141.    As a direct result of Defendants aiding, abetting, and conspiring with al-Qaeda to effectuate the murders of the 9/11 Decedents, Defendants engaged in conduct that was malicious, outrageous and in willful, wanton, and reckless disregard of the rights of the 9/11 Decedents and all Plaintiffs.  The Defendants, acting individually and jointly, intended to carry out actions that

would end the lives of the Decedents.

142.     Plaintiffs are entitled to solatium and other damages, which are trebled under 18 U.S.C. § 2333(a).

143.     As a result of their intentional, malicious, outrageous, willful and wanton conduct, Defendants are jointly and severally liable to all Plaintiffs for punitive damages, which are trebled under 18 U.S.C. § 2333(a).

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly, severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000) for compensatory, punitive damages and solatium, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate, to be trebled under 18 U.S.C. § 2333(a).

Respectfully Submitted,

Date:   September 24, 2025                /s/ *Timothy B. Fleming*
                                          Timothy B. Fleming (DC Bar No. 351114)
                                          WIGGINS CHILDS PANTAZIS
                                          FISHER GOLDFARB, PLLC
                                          2202 18th Street, NW, #110
                                          Washington, DC  20009-1813
                                          (202) 467-4489

                                          Dennis G. Pantazis (AL Bar No. ASB-2216-A59D)
                                          WIGGINS CHILDS PANTAZIS
                                          FISHER GOLDFARB, LLC   (*Lead Counsel*)
                                          The Kress Building
                                          301 19th Street North
                                          Birmingham, AL  35203
                                          (205) 314-0500

                                          Richard D. Hailey (IN Bar No. 7375-49)
                                          Mary Beth Ramey (IN Bar No. 5876-49)
                                          RAMEY & HAILEY
                                          3905 Founders Road
                                          Indianapolis, IN 46268
                                          (317) 582-0000

Robert M. Foote (IL Bar No. 03124325)
Craig S. Meilke (IL Bar No. 03127485)
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL  60134
(630) 232-7450

*Attorneys for the* Romero *Plaintiffs*